UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| CONTROL SCREENING, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 4:11-CV-3011 |
| | § | |
| INTEGRATED TRADE SYSTEMS, INC.; | § | |
| | § | |
| Defendants. | § | |
| | § | |

## MEMORANDUM AND ORDER

**I.     INTRODUCTION**

Before the Court is the joint motion for summary judgment filed by defendants', Pemex-Petroguimica ("Pemex") and Integrated Trade Systems, Inc., ("ITS") (Dkt. No. 83). Also, before the Court is ITS separate motion for summary judgment on the issue of agency (Dkt. No. 82).[1] The plaintiff, Control Screening, LLC ("CSLLC") has filed responses to the motions (Dkt. No. 84-85), the motions are ripe for adjudication. After a careful review of the parties' submissions, the undisputed facts and the applicable law, the Court is of the opinion that Pemex and ITS's joint motion for summary judgment should be GRANTED; and that ITS's separate motion is DENIED as moot.

**II.    FACTUAL BACKGROUND**

On or about August 21, 2009, ITS, as agent-purchaser for Pemex, submitted a Request for Quotation ("RFQ") to CSLLC for the purchase of dual energy x-ray scanners and/or security devices. CSLLC responded to the RFQ on or about August 27, offering to manufacture and sell the scanners to Pemex for the price of $20,100 each. The record shows that the parties had been

---

[1] ITS' motion for summary judgment based on its claim that it was merely an agent for Pemex need not be addressed in light of the disposition of its joint motion for summary judgment on other claims.

engaged in discussions as early as June of 2009. In spite of the many certainties in CSLLC's quote, Purchase Orders ("POs") were submitted to CSLLC on or about November 2, 2009. From August 27 to November 2, the parties continued to refine their understanding but focused primarily on a delivery date and the method of payment. ITS required a delivery by December 31, on a "Net 20 day" method of pay. CSLLC agreed to the delivery date, but insisted on a letter of credit or cash payment. Nevertheless, the POs dated November 2 were issued by ITS based on the "Net 20 day" payment term.

After October 26, when CSLLC assured ITS that it would make a timely delivery, it began, what it describes as, "critical assemblies." The x-ray generators were manufactured to specifications and were shipped to the Philippines for final assembly and testing. However, the record shows that CSLLC never signed the POs, pursuant to instructions, but did give assurances that it would deliver the scanners while the parties sought to resolve their method of payment issues. The record also shows that ITS continued to pursue a written assurance.

On November 25, ITS inquired whether CSLLC was going to accept Pemex's POs by executing them. Again, CSLLC raised the credit issue and questioned whether the method of payment could be resolved. It further stated that because of the history of credit issues with other companies in Mexico and market conditions, it would not ship to Mexico without either partial payment or a letter of credit. On December 3, ITS again inquired whether the issue of credit could be resolved and whether CSLLC would deliver the scanners before the end of December of 2009. On December 16, the issue of CSLLC's intentions regarding acceptance of the POs was raised. In a lengthy reply on December 18, CSLLC responded that it was unwilling to take the risk associated with a Net 20 day payment. Yet, again on December 21 and December 23, the parties exchanged emails about the method of payment without resolution. Shortly thereafter,

and before December 31, ITS cancelled the POs. The record reflects that no delivery was attempted by CSLLC.

### III.   CONTENTIONS OF THE PARTIES

#### A.   *CSLLC's Contentions*

According to CSLLC, while relying on the fact that a contract was in place, it began manufacturing the scanners for Pemex. In late December, after it had spent "considerable and substantial sums in materials and labor toward the completion of the manufacture," ITS attempted to repudiate the contract. Specifically, CSLLC contends that "critical assemblies, including the x-ray generators, had been manufactured to order at [CSLLC's] main factory . . . and shipped . . . to its plant in the Philippines for final assembly and testing." Because the scanners were manufactured pursuant to the contract, CSLLC contends that they "will have to be stored and altered before they can be resold to other customers."

#### B.   *Pemex and ITS' Contentions*

ITS disputes CSLLC's claim that a contract was ever consummated in August of 2009. Specifically, ITS asserts that CSLLC never accepted Pemex's POs and its quotation alone does not form a contract. While ITS may have assented to CSLLC's quotation, ITS made it clear that CSLLC's quotation was simply that – a quotation. Hence, argues ITS, the quotation never became a contract. Moreover, it argues, Pemex was not obligated to buy the scanners unless the POs that were forwarded to CSLLC in October were accepted according to the terms for payment. According to Pemex and ITS, CSLLC refused to sign the POs; therefore, no contract was ever formed.

## IV. SUMMARY JUDGMENT

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. A fact is "material" if its resolution in favor of one party might affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248. An issue is "genuine" if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party. *Id.* If the evidence rebutting the motion for summary judgment is only colorable or not significantly probative, summary judgment should be granted. *Id.* at 249-50; *see also Shields v. Twiss*, 389 F.3d 142, 149-50 (5th Cir. 2004).

Under Rule 56(c) of the Federal Rules of Civil Procedure, the moving party bears the initial burden of "informing the district court of the basis for its motion and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue for trial." *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 - 87 (1986); *Adams v. Travelers Indem. Co. of Connecticut,* 465 F.3d 156, 163 (5th Cir. 2006). Where the moving party has met its Rule 56(c) burden, the nonmovant must come forward with "specific facts showing that there is a *genuine issue for trial."  Matsushita*, 475 U.S. at 586-87 (quoting Fed. R. Civ. P. 56(e)) (emphasis in original); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); and *Adams*, 465 F.3d at 164. To sustain the burden, the nonmoving party must produce evidence admissible at trial showing that reasonable minds could differ regarding a genuine issue of material fact. *Anderson*, 477 U.S. at 250-51; 255; *Morris v. Covan World Wide Moving, Inc.,* 144 F.3d 377, 380 (5th Cir. 1998). In deciding a summary judgment motion, "[t]he evidence of the nonmovant

is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson,* 477 U.S. at 255.

## V. ANALYSIS AND DISCUSSION

The Court is of the opinion and holds that CSLLC never formally accepted the contract pursuant to the terms of the POs. In the case at bar, Pemex delivered its POs to CSLLC on November 2, 2009. The record shows that accompanying the six POs was a cover letter that stated the following:

> Enclosed please find our [Purchase Orders], which ha[ve] been awarded to your company *for review, and signature of acceptance*.
>
> Also please take note that **NO** amendments are to be made on the face of the [Purchase Orders], and any non-acceptance terms must be made in writing.
>
> We ask that once you have reviewed and accepted the [Purchase Orders], *to please sign and date the original that reads "COPY" on the left bottom corner, and have it returned to us via courier and express mail*.

(Dkt. No. 83, p. 19)(emphasis added). The POs consisted of six pages each and were signed by ITS on behalf of Pemex. Each page of each PO stated: "By acceptance of this Purchase Order and performance hereunder the supplier agrees to comply fully with the conditions of purchase stated on the reversed side hereof and hereby made a part of this order." In addition, each page contained a signature block for CSLLC's authorized signature and date.

Under these facts, in order for CSLLC to prove that a contract existed, it must establish that there was a meeting of the minds on each material term of the offer. *See Great Western Sugar Co. v. Lone Star Donut Co.,* 567 F. Supp. 340, 342 (N.D. Tex. 1983); *see also Kroeze v. Chloride Group Ltd*, 572 F.2d 1099, 1105 (5th Cir. 1978). It is ITS' position that a condition precedent to the consummation of the contract between Pemex and CSLLC was the execution of

the POs. It is also clear that the parties never reached an agreement on a critical term, *i.e.,* the terms of payment. It is also undisputed that in December of 2009, shortly before ITS cancelled the POs, CSLLC was still negotiating the terms of payment. CSLLC's concerns centered on the prospect of depreciation in Mexican currency, political risks, and the fact that Pemex would be slow to pay or not pay at all. How and when CSLLC would be paid was critical to the transaction particularly since it would not permit the scanners to leave the United States or its factory in the Philippines without currency changing hands or a letter of credit in hand.

CSLLC argues that its quote and the POs combined with the correspondence between the parties are sufficient evidence of the formation of a contract under Article 2 of the Uniform Commercial Code. In support of its position that a contract was formed, CSLLC points to: (a) ITS' request for a confirmation letter on October 20 that it could meet Pemex's delivery deadline of December 31; (b) the issuance of the POs after the confirmation letter on October 26, for the purchase of 26 scanners; (c) notification to ITS on December 9 that it had commenced construction; and (d) ITS' repeated invitation for "CSLLC to perform on the contract by advising that '[w]e need to receive the equipment before year ends, otherwise Pemex will cancel the orders.'" CSLLC then argues that "Mr. Schafer [CSLLC's representative] understood this to mean that there was a valid contract between [CSLLC] and [D]efendants, provided that [CSLLC] would deliver the x-ray machines by the end of 2009."

It is abundantly clear from the exchange between the parties that the terms of payment and the delivery date were material and critical to the formation of a contract between the parties. Whether CSLLC could manufacture and deliver the scanners was not a factor in the formation of a contract after October 26. Adjustments in various other terms of the POs were not factors in the formation of a contract. Instead, from October 20 through late December, the two critical

issues were timely delivery and method of payment. ITS received confirmation on the delivery issue but would not relent on the method of payment. On December 18, CSLLC made it clear to ITS that CSLLC would not execute and return the POs unless the term of payment was changed. Equally important, the scanners would not leave the Philippines unless the payment terms were satisfactory with CSLLC.

While the Uniform Commercial Code does seek to clarify the rules for contract formation between merchants, it does not offend the common law rule that contract formation rests in "a meeting of the minds" on material points. *See* Tex. Bus. & Comm. Code §§ 1.305(a) and 2.104(c). A term payment is a material point where merchants are not engaged in a course of dealings such that the method of payment may be presumed. Here, it was not Pemex's intention to pay in advance or provide a letter of credit; and it was not CSLLC's intention to ship the goods without payment. Hence, CSLLC's understanding, to the contrary, is of no consequence because a critical material term of the contract remained unresolved. Case law addressing this and similar issues is abundant. *See Effel v. McGarry*, 339 S.W.3d 789, 793 (Tex. App.-Dallas, 2011, pet. filed); *Pontcinske v. McDonald Property Investments, Ltd.*, 245 S.W.3d 526, 528-31 (Tex. App.-Houston [1st Dist.] 2007, no pet.); *Lloyd v. Holland*, 659 S.W.2d 103, 105 (Tex. App.-Houston [14th Dist.] 1983, no writ).

## VI.    CONCLUSION

CSLLC has failed to establish or present evidence that a genuine issue of material fact exists concerning the absence of an agreement on a material point, *i.e.,* the term of payment requirement. *Matsushita*, 475 U.S. at 586-87. There was no meeting of the minds. *Id.* Therefore, the Court holds, based on the analysis and discussion that no contract between the

parties was consummated. Accordingly, Pemex and ITS' motion for summary judgment is hereby GRANTED.

It is so Ordered.

SIGNED at Houston, Texas this 27th day of August, 2012.

_____
Kenneth M. Hoyt
United States District Judge